**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0185n.06
Filed: April 4, 2008

**No. 06-6540**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

DOROTHEA BROUGHTON and
MICHAEL BROUGHTON,

     Plaintiffs-Appellants,

v.

ADAMS PONTIAC BUICK GMC TRUCK,
INC.,

     Defendant-Appellee.

                             /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY

BEFORE:    CLAY and  McKEAGUE, Circuit Judges; and BOYKO, District Judge.[*]

     **CLAY, Circuit Judge.** Plaintiffs Dorothea and Michael Broughton appeal the district

court's decision denying their claims under the Kentucky Consumer Protection Act, KRS § 367.170,

and under Kentucky common law, which arose out of their purchase of a new pickup truck. While

holding that it had supplemental jurisdiction to hear Plaintiffs' claims, the district court granted

summary judgment to Defendant, holding both that Plaintiffs' own testimony conflicted with their

claim that Defendant inflated an interest rate, and that no other genuine issue of fact existed as to the

price of the vehicle. While we agree with the district court that the record does not support a claim

---

     [*]The Honorable Christopher A. Boyko, United States District Judge for the Northern District
of Ohio, sitting by designation.

that Defendants misrepresented the interest rate, the record does not account for a discrepancy between the sticker price of the truck and the base price charged to Plaintiffs. Accordingly, we **AFFIRM** the decision of the district court in part, **REVERSE** in part, and **REMAND** this case to allow the district court to resolve the discrepancy with respect to the price of the vehicle, and for the district court to resolve a genuine issue of material fact regarding whether Plaintiffs intended to use the new truck primarily for the purposes stated in the Kentucky Consumer Protection Act.

## STATEMENT OF FACTS

Plaintiffs Dorothea and Michael Broughton were living in Massachusetts in the spring of 2002, when they decided to move to Kentucky and purchase a farm. As part of this decision, Plaintiffs also chose to trade in their Volvo for a heavy-duty pickup truck suitable for farm use. According to Michael's testimony, they eventually chose to purchase a GMC Sierra because it would be able to "[m]ove rocks, get fence posts, hay, [and] stuff that horses need, like grain." (J.A. 155.) Dorothea also testified that the Sierra would allow them to tow a trailer during their move from Massachusetts to Kentucky, to tow a horse trailer on their new farm, and to seat their kids in the truck's back seat.

Plaintiffs also testified that the principal purpose of their new farm would be recreational. Although Michael testified that he would "like to start something with alpacas"[1] such as raising the animals for wool and "possibly selling it to Churchill Weavers," Plaintiffs never purchased any alpacas. (J.A. 155–56.) Furthermore, while Plaintiffs grew hay on their Kentucky farm, they gave this hay away to their neighbor for free and had never received any money for this crop. Dorothea

---

[1]An alpaca is a domesticated animal similar in appearance to a small llama.

testified that she and her husband purchased four horses for "my children to ride and for me to ride." They never sold any of the horses, and they did not board other people's horses at their farm. Both Plaintiffs earn their living as teachers.

With respect to their new truck, Plaintiffs contracted with Defendant, a Kentucky car dealership, to purchase a new GMC Sierra on April 19, 2002. Both parties agree that Plaintiffs were shown the sticker price of the vehicle—$35,983.00—prior to the purchase. Michael testified that the dealer agreed to reduce that price through a $2002 rebate, and by another $2000 as credit for trading in the Volvo. Inasmuch as Plaintiffs made a $5000 down payment on the truck, these figures would result a loan of $26,981.00. As part of the sale, however, Defendant also agreed to pay off the remainder of the money owed on Plaintiffs' trade-in, on the condition that this amount would also be financed. Michael testified that, at the time of the sale, he believed that he still owed between $17,000 and $19,000 on the Volvo. Thus, using Plaintiffs' figures, the total amount financed should have been at least $43,981.[2]

With respect to the interest rate on this loan, however, Plaintiffs' own testimony portrays a couple who may have been unaware of the nature of the bargain they were striking. Michael testified that they originally hoped to receive "0.0" financing on their loan, (J.A. 162,) but that after

---

[2]Plaintiffs' analysis, is as follows:

```
 $35,983.00 sticker price
  - 2,000.00 trade-in credit
  - 5,000.00 down
  - 2,002.00 rebate
 +17,000.00 pay-off of Volvo
 -------------------------------------
 $43,981.00 Financed
```

purchasing the truck he had the "feeling . . . that they were going to get me an [sic] interest between 2 and 6 percent . . . ." (J.A. 167.) Michael also admitted that he had no discussion with the dealer about how much his monthly payment would be or the number of payments he would have to make, and that the dealer never told him what the interest rate would be. Moreover, according to Dorothea's testimony, Plaintiffs knowingly signed incomplete financing and purchase agreements in which the terms of the sale were left blank to be filled in later.

The actual terms of the sale were very different from the one Plaintiffs described. According to a purchase agreement signed by Dorothea, the "cash price of vehicle" was $43,086.80, not the $35,983.00 sticker price. (J.A. 148.) Furthermore, the purchase agreement calculated the value of Plaintiffs' trade-in Volvo at $26,000, but also determined that Plaintiffs owed $24,544.51 on this Volvo—resulting in a credit of only $1455.49 to Plaintiffs. The purchase agreement also added $1943.08 in sales tax and $199.00 in "handling & fees," resulting in a total purchase price of $43,773.39. (*Id.*) Minus $7002.00 "cash down," the purchase agreement resulted in $36,771.39 of this purchase being financed.[3] (*Id.*)

---

[3]Defendant's analysis, is as follows:

```
  $43,086.80 "cash price"
- $26,000.00 trade-in credit
+$24,544.51 owed on Volvo
+    $199.00 "handling and fees"
-  $7,002.00 "cash down,"
-------------------------------------
  $36,771.39 Financed
```

The purchase agreement also adds a $1995.00 "service contract," for a final total of $38,766.39. (J.A. 148.)

This financing, however, was done at a much higher interest rate than the two to six percent Michael said he had the "feeling" he would receive. Under the financing agreement, which was signed by both Michael and Dorothea, Plaintiffs agreed to pay a 14.34% interest rate. This high interest rate resulted in monthly payments of $806.00, when Plaintiffs had previously paid only $320.00 on their Volvo. Nevertheless, Plaintiffs made payments and used the new truck for at least five months before they attempted to rescind the sale. When Defendant refused to agree to the rescission, Plaintiffs continued to make payments for about two more years, tendering a total of 30 monthly payments to Defendant.

This case was filed in December 2003, more than a year and a half after the original sale, alleging that Defendant misrepresented the actual cost of the vehicle at the time of sale, in violation of both the Kentucky Consumer Protection Act and Kentucky common law. Plaintiffs also alleged federal truth in lending violations, although those claims were eventually dismissed.

## DISCUSSION

### *Jurisdiction*

A federal district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). When a district court has dismissed all claims over which it had original jurisdiction, the court has discretion to "decline to exercise supplemental jurisdiction" over state law claims with respect to which it initially asserted jurisdiction. § 1367(c)(3). Remand of the state law claims to state court is not mandatory. *Id.* "[W]hen deciding whether to exercise supplemental jurisdiction, a federal court

5

should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotations omitted).

The district court initially had original jurisdiction over Plaintiffs' federal truth-in-lending claim, and supplemental jurisdiction over the Kentucky law claims now on appeal. *See* § 1367(a). Noting that both the federal and state claims arose out of the same sale between Plaintiffs and Defendant, the district court exercised its discretion to retain jurisdiction over Plaintiffs' state law fraud claims once their federal claim was dismissed, (J.A. 111,) and granted summary judgment to Defendant on both claims of fraud. Because this grant of summary judgment was a final judgment of a district court, this Court now has jurisdiction to hear this appeal. 28 U.S.C. § 1291.

### *Standard of Review*

This Court reviews a district court's grant of summary judgment *de novo*. *Spirit Airlines v. Northwest Airlines, Inc.*, 431 F.3d 917, 930 (6th Cir. 2006). Summary judgment will be affirmed if "the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact" which comprises an essential element of the non-moving party's case. Fed.R.Civ.P. 56(c). If, on the other hand, "a reasonable jury could return a verdict for the non-moving party," summary judgment for the moving party is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing the district court's decision, this court draws all justifiable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

6

Despite the inferences drawn in the non-moving party's favor, the party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts," *Id.* at 586, and may not contest a properly supported summary judgment motion merely by relying on the pleadings. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 324 (1986). Rather, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). This Court has no obligation to "wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *See InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 110-11 (6th Cir. 1989).

*Analysis*

## I. PLAINTIFFS HAVE STATED A CLAIM UNDER KENTUCKY'S CONSUMER PROTECTION ACT

Kentucky's Consumer Protection Act ("CPA") prohibits "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." KRS § 367.170(1). A private cause of action exists under this statute when the injured party purchased or leased goods or services "primarily for personal, family or household purposes . . . ." § 367.220(1). The district court held that Plaintiffs' intended use of their truck to help run a farm did not constitute "personal, family or household purposes," and therefore concluded that they could not seek relief under the CPA. For the reasons that follow, we disagree.

The Supreme Court of Kentucky has only twice interpreted the CPA's limitation of private suits to cases involving goods or services used "primarily for personal, family or household purposes." In *Stevens v. Motorists Mutual Insurance Company*, 759 S.W.2d 819 (Ky. 1988), relying largely on the Act's plain language, Kentucky's highest court held that a family who "purchased a

7

homeowners' insurance policy protecting their home against certain losses . . . are the class of persons who purchased services primarily for personal, family or household purposes." *Id.* at 820. Accordingly, *Stevens* allowed that family to recover against their insurance company. *Id.* at 821. In *Guaranty National Insurance Company v. George*, 953 S.W.2d 946 (Ky. 1997), however, the same court distinguished *Stevens* from a case involving the sale of a *commercial* liability policy. *Id.* at 950. These cases make clear that the CPA's private cause of action excludes commercial transactions—that is, transactions which are made with the principal intent of generating a profit.

The district court held that, because the truck at issue in this case "was purchased to be used primarily for farming purposes," Plaintiffs did not intend for it to be used "primarily for personal, family or household purposes." (J.A. 118.) This holding reads the words "personal, family or household" far too narrowly. Plaintiffs are not farmers; they are schoolteachers who live on a farm. While they keep horses on the farm, they keep these horses solely for personal and family use as recreational riding animals. They grow some crops on the farm, but they give these crops away for no profit. And while Michael Broughton did admit that he would "like to start something with alpacas," he has yet to purchase a single alpaca. (J.A. 155.) Moreover, even if Plaintiffs did intend to put the truck to some commercial purpose, the CPA still allows them to recover if they purchased it "*primarily* for personal, family or household purposes." § 367.220 (emphasis added). At the very least, a genuine issue of material fact exists as to whether the truck was purchased primarily to maintain a commercial alpaca farm, and the district court erred in holding otherwise.

The district court relied on *Gooch v. E.I. DuPont de Nemours & Co.*, 40 F. Supp.2d 857 (W.D. Ky. 1998) in holding that Plaintiffs failed to state a claim under the CPA, yet this case

supports a holding that the availability of the Act hinges upon whether a plaintiff principally intended to profit from a transaction. In *Gooch*, the court held that a company which was "primarily in the business of farming" could not seek relief under the CPA because it purchased the goods at issue in that case to "maximize its profits." *Id.* at 862. Unlike the company in *Gooch*, Plaintiffs are schoolteachers who appear to enjoy farming as a hobby. They have earned no profits off of their farm.

The district court also relied on *Aud v. Illinois Central Railroad Co.*, 955 F. Supp. 757 (W.D. Ky. 1997) and *Cohen v. North Ridge Farms, Inc.*, 712 F. Supp. 1265 (E.D. Ky. 1989) which held that railroad ballast, ties and tracks and a thoroughbred horse, respectively, were not "consumer goods" protected by the CPA. *Aud*, 955 F.Supp. at 759; *Cohen*, 712 F. Supp. at 1271. These cases are inapposite, however, as the instant case involves the sale of a pickup truck, a good routinely sold in the consumer market.

The district court erred in holding that, because Plaintiffs intended to use the truck they purchased to help run a farm, it necessarily followed that they were not operating that farm for personal, family or household use. On remand, the district court must resolve the genuine issue of material fact over whether Plaintiffs intended to use their new truck primarily for the purposes stated in the CPA.

## II. A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER DEFENDANT MADE MISREPRESENTATIONS TO PLAINTIFFS

### A. The CPA

Under the CPA, Plaintiffs may recover if they can prove "unfair, false, misleading, or deceptive acts or practices" on the part of Defendant. KRS § 367.170(1). Plaintiffs allege that

9

Defendant misled them both by charging a higher interest rate than the parties agreed to, and by inflating the base price of the truck. For the reasons which follow, we hold that the first allegation lacks merit, but that the second claim may proceed to trial.

### 1. Interest Rates

Plaintiffs first allege that Defendant agreed to finance the truck at an interest rate of 6% or less, and that it fraudulently inflated this rate to 14.34%. Plaintiff Michael Broughton's own testimony, however, belies this claim. While Michael testified that he had the "feeling . . . that [Defendant was] going to get me an [sic] interest between 2 and 6 percent," he also admitted that he had no discussion with the dealer about how much his monthly payment would be or the number of payments he would have to make, and that the dealer never told him what the interest rate would be. (J.A. 167–68.) Given this admission, there is no genuine issue as to whether or not Defendant misled Plaintiffs about their interest rate. For Defendant to have misled Plaintiffs, it would have needed to make an actual representation as to what the interest rate would be. Plaintiff Michael Broughton admits that such a representation did not occur. Accordingly, the district court properly dismissed Plaintiffs' claim regarding their interest rate.

### 2. Base Price of the Truck

We reach a different conclusion, however, with respect to Plaintiffs' claims regarding the base price of the truck. Defendant admits that, at the time of the purchase, Plaintiffs were shown the sticker price of the truck they purchased, $35,983.00, and a document included in the record confirms this price. (J.A. 64) Nevertheless, the purchase agreement, which Plaintiff Dorothea Broughton claims was blank at the time that she signed it, lists the "Cash Price of Vehicle" at

$43,086.80. (J.A. 62.) Defendant does not provide any explanation for the $43,086.00 base price listed on the purchase agreement.

Rather than explaining the rationale behind this number, Defendant repeats an error made by the district court. The district court noted that, had the total cost of the vehicle been calculated according to the figures described in Plaintiffs' testimony, Plaintiffs would have financed approximately $43,500, rather than the approximately $38,700 actually charged to Plaintiffs under the purchase agreement.[4] The district court then concluded that, because the actual price of the vehicle was less than the final cost of the vehicle had the price been calculated using all of Plaintiffs' numbers, Plaintiffs could not possibly be victims of fraud.

It does not follow, however, from the fact that Plaintiffs themselves miscalculated the cost of the truck that Defendant did not overcharge Plaintiffs. Defendant admits that the sticker price of the truck was $35,983.00. It provides no explanation for the $43,086.80 base price listed on the purchase agreement. Accordingly, a genuine issue of material fact exists as to whether Defendant fraudulently inflated the base price of the vehicle, and the decision of the district court dismissing Plaintiffs' claim that the base price of the vehicle was inflated must be reversed. On remand, the district court shall determine why the sticker price is inconsistent with the base price actually charged

---

[4]Recall that Plaintiffs calculated the cost of the vehicle as follows: $35,983.00 sticker price- 2,000.00 trade-in credit - 5,000.00 down - 2,002.00 rebate +17,000.00 pay-off of Volvo = $43,981.00 Financed.

The purchase order made the following calculation: $43,086.80 "cash price"- $26,000.00 trade-in credit + $24,544.51 owed on Volvo + $199.00 "handling and fees" - $7,002.00 "cash down" + $1995.00 "service contract" = $38,766.39.

to Plaintiffs. Defendant may prevail if it can demonstrate that Plaintiffs were made aware of and/or agreed to the $43,086.80 base price prior to their signing the purchase agreement.

## B.    Common Law Fraud

Plaintiffs also allege that Defendant committed common law fraud in misrepresenting the sale price of the truck. To state a common law fraud claim under Kentucky law, Plaintiffs must prove six elements: 1) Plaintiffs must show that Defendant made a "material misrepresentation;" 2) "which is false;" 3) which Defendant knew "to be false or made recklessly;" 4) which was made in order to induce Plaintiff to act in a certain manner; 5) that Plaintiff so acted in reliance on the misrepresentation; and, 6) that Plaintiff was injured as a result of this reliance. *Denzik v. Denzik*, 197 S.W.3d 108, 110 (Ky. 2006). "Fraud may be established by evidence which is wholly circumstantial." *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).

As discussed above, Plaintiffs have not raised a genuine issue of material fact as to whether Defendant made a "material misrepresentation" regarding the interest rate of the truck's financing. Accordingly, Plaintiffs' common law fraud claim regarding the interest rate lacks merit. *See Denzik*, 197 S.W.3d at 110. With respect to the base price of the truck, however, we conclude that the discrepancy between the sticker price and the actual price charged to Plaintiffs raises enough of an inference that Defendant may have knowingly or recklessly made false statements, which induced Plaintiffs to purchase an overpriced truck, to allow a jury to resolve this claim. Accordingly, we reverse the district court insofar as it held that no issue of material fact exists regarding whether Defendant misrepresented the base price of the truck.

## C.    "Unreasonable Delay"

12

Defendant, relying on *Gargotto v. Sherman*, 180 S.W.2d 565 (Ky. 1944), argues that Plaintiffs, by continuing to use the truck after discovering its allegedly inflated purchase price, "cannot now claim that they are entitled to revoke acceptance of the Sierra." (Defendant's Br. at 13) In *Gargotto*, Kentucky's then-highest court held that when the purchaser of a good engages in "unreasonable delay" in attempting to rescind a sale, "the purchaser affirms the sale and loses his right of rescission." *Id.* at 566. *Gargotto*, however rested upon KRS § 361.690, which has since been repealed. *See id.* at 599.

KRS § 361.690 was included in Kentucky law as part of the Uniform Sales Act, which Kentucky has since been replaced with the Uniform Commercial Code ("UCC"). *See* KRS § 361. The UCC, however, does not control this case. Generally speaking, a claim filed under the CPA is timely if filed within that statute's two year statute of limitations. KRS § 367.220(5). We can find no provision of Kentucky law which imposes an "unreasonable delay" standard on claims brought under the CPA. Similarly, although the UCC contains a provision requiring a buyer rejecting tendered goods to do so "within a reasonable time," KRS § 355.2-607, the UCC supplements, but does not displace claims for common law fraud. *See* KRS § 355.1-103. Accordingly, even if we were to hold that a fraud claim under the UCC must be brought "within a reasonable time" of an allegedly fraudulent sale, no provision of Kentucky law applies this UCC standard to common law fraud claims. Accordingly, Defendant's claim that this case was not timely filed lacks merit.

**CONCLUSION**

The district court properly granted summary judgment to Defendant regarding whether Defendant misrepresented the interest rate charged to Plaintiffs. Nevertheless, the district court erred

in holding that no genuine issue of material fact exists both with respect to Plaintiffs' intended use for their new vehicle, and with respect to the discrepancy between the truck's sticker price and the actual price of the truck at sale. Accordingly, we **AFFIRM** in part the grant of summary judgment to Defendant with respect to the interest rate issue, and **REVERSE** and **REMAND** with respect to Plaintiffs' claim regarding the price discrepancy and the intended use of the new vehicle.